1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9
10
11

UNITED STATES OF AMERICA,

      Plaintiff,

12  v.

13

JOAN V. BAYLEY, et al.,

14

      Defendants.

15

CASE NO. 3:20-cv-05867-DGE

ORDER GRANTING PLAINTIFF'S
MOTION FOR DEFAULT
JUDGMENT (DKT. NO. 186)

16

## I  INTRODUCTION

17

  This matter comes before the Court on Plaintiff United States of America's motion for

18 default judgment.  (Dkt. No. 186.)  Defendants Joan Bayley, Big D's Beach Cabin LLC ("Big

19 D's"), and Philip Bayley, in his capacity as trustee of Frihet Trust, did not respond.  Mr. Bayley,

20 in his individual capacity, responded late and seeks relief from this deadline.  (Dkt. Nos. 194,

21 195, 196, 198.)  Having reviewed the motion, Mr. Bayley's response, all supporting materials,

22 and the record, the Court GRANTS the motion and ENTERS DEFAULT JUDGMENT against

23 Defendants Joan Bayley, Big D's, and Philip Bayley in his individual and trustee capacities.

24

## II      BACKGROUND

On August 27, 2020, Plaintiff sued Defendants for allegedly violating the Clean Water Act ("CWA") by unlawfully discharging dredge or fill material "into waters of the United States including Hood Canal on property then owned by Big D's Beach Cabin, LLC, . . . (the 'Site')[.]"[1]  (Dkt. No. 1 at 1.)  Plaintiff also claimed Defendants fraudulently transferred title and wrongfully distributed Big D's assets to avoid CWA penalties.  (*Id.* at 7–8.)

### A. Plaintiff's Allegations

In its complaint, Plaintiff alleges the following facts.  On May 11, 2017, Mr. Bayley contracted with an engineering firm to design a bulkhead to be located on the Site, intending to build a house ten feet landward of the bulkhead.  (*Id.* at 5.)  Around a week later, Mr. Bayley and his mother, Ms. Bayley, formed Big D's and registered it with the Washington Secretary of State.  (*Id.*)  On June 5, 2017, the engineering firm provided Mr. Bayley plans for the bulkhead.  (*Id.*)  Big D's purchased the Site for $90,000 and recorded its deed with the Mason County Auditor.  (*Id.* at 6.)  On July 29, 2017, Mr. Bayley signed a contract with South Sound Concrete Construction to construct a replacement bulkhead on the Site, which was paid for by Big D's as well as Mr. and Ms. Bayley from their personal accounts.  (*Id.*)  Bulkhead construction began August 1, 2017.  (*Id.*)

Soon after, beginning August 11, 2017, the U.S. Army Corps of Engineers notified Defendants that construction of the bulkhead violated the CWA if continued without first obtaining a Section 404 permit.  (*Id.*)  The construction involved an excavator and trucks that discharged dredged or fill material at the Site, including dirt, spoil, rock, sand, and concrete

---

[1] In its complaint, Plaintiff defines "the Site" as Mason County parcel 32235-32-00020 located on East State Route 106, Union, Washington.  (Dkt. No. 1 at 1.)

along the shoreline and below the high tide line of Hood Canal.  (*Id.* at 5.)  On July 26, 2018, the EPA sent a Notice of Violation informing Defendants that construction of the bulkhead violated the CWA.  (*Id.* at 6.)  At some point, EPA directed Defendants to remedy their violations or face enforcement action.  (*Id.* at 8.)

On December 13, 2019, Mr. and Ms. Bayley "disbursed the assets of [Big D's] without making provisions for the payment of creditors of [Big D's] or for its liabilities for violating the [CWA]."  (*Id.* at 6.)  Specifically, they signed a quitclaim deed conveying Big D's interest in the Site to Ms. Bayley, which was recorded in the Mason County Assessor's office on January 22, 2020.  (*Id.* at 7.)  Big D's received neither cash nor property in exchange although the transferred real property was worth at least $105,205 at the time.  (*Id.*)  As a result, Big D's became insolvent.  (*Id.* at 8.)  Mr. and Ms. Bayley allegedly knew the United States had claims for violations of the CWA when they distributed Big D's assets.  (*Id.* at 9.)

On December 13, 2019, Ms. Bayley signed a quitclaim deed conveying her interest in the Site to the trustee of Frihet Trust, which was recorded in the Mason County Assessor's office on January 22, 2020.  (*Id.* at 7.)  Frihet Trust did not pay Ms. Bayley cash or property in exchange for the transfer.  (*Id.*)

On August 11 and August 17, 2020, Mr. Baylee as trustee of Frihet Trust (or individuals acting on his behalf) used equipment to discharge concrete and other fill material in Hood Canal below the high tide line without a Section 404 permit to construct a stairway adjacent to the bulkhead and to fill the shoreline behind the bulkhead.  (*Id.* at 9.)

Plaintiff alleges four claims against Defendants, two of which are CWA claims.  Plaintiff alleges Defendants violated 33 U.S.C. § 1311(a) by discharging dredge or fill material into the

Hood Canal during bulkhead construction in 2017 and in 2020. (*See id.* at 4, 9.) Plaintiff also

alleges Defendants engaged in fraudulent transfers in violation of 28 U.S.C. § 3304. (*Id.* at 7.)

> [Mr. Bayley, Ms. Bayley, and Big D's] engaged in the transfers on December 13,
> 2019, with intent to hinder, delay, or defraud creditors, including the United States,
> to protect and preserve the real property for Defendants' own use and benefit, and
> to prevent and hinder the United States from seeking restoration of the Site and
> recovering other relief prescribed by the Clean Water Act for unpermitted
> discharges of dredged and fill material [in violation of 28 U.S.C. § 3304 and
> Revised Code of Washington § 19.40.081].

(*Id.* at 8.) Finally, Plaintiff alleges Mr. and Ms. Bayley "distributed the assets of [Big D's]

without paying or providing for their CWA violations in violation of 31 U.S.C. § 3713. (*Id.*)

**B. Court's Sanctions Order Against Defendants**

On September 19, 2022, the Court granted Plaintiff's motion and sanctioned Defendants

for their flagrant discovery abuses by entering default, striking Defendants' amended answer,

and dismissing Defendants' counterclaims without prejudice. (Dkt. No. 182 at 24.) Because the

Court chronicled Defendants' discovery misconduct in its sanctions order, it does not recount it

here. (*See id.* at 2–8.) The Court also ordered Defendants' ability to pay an appropriate CWA

penalty be taken as established. (*Id.* at 24.)

**C. Mr. Bayley's Response to Plaintiff's Motion for Default Judgment**

On November 14, 2022, Mr. Bayley moved for "relief from a deadline." (Dkt. No. 194.)

Mr. Bayley appears to ask the Court to consider his declaration (Dkt. No. 195) and his motion for

relief under Federal Rule of Civil Procedure 60(b) (Dkt. No. 189, re-filed Dkt. No. 195-2) as a

late-filed response to Plaintiff's motion for default judgment. Mr. Bayley states:

> Defendant presents its Responses to [Dkt. No. 186] through Exhibit 1 of Bayley's
> declaration attached herein and [Dkt. Nos.] 189 and 191 so he could promptly bring
> to the Court's attention Plaintiff's perjury and fraud on the Court confirmed and
> admitted to by Plaintiff in its [motion for default judgment] and relevant material
> new evidence that impacts nearly every filed brief in this case[.]

(Dkt. No. 194 at 5.)  Mr. Bayley filed the same 127-page document twice.  (*See* Dkt. Nos. 189, 195-2.)  The Court denied Plaintiff's motion for relief under Federal Rule of Civil Procedure 60(b) (Dkt. No. 189) as premature.  (*See* Dkt. No. 204.)   Thus, the Court considers Mr. Bayley's filing at Dkt. No. 195-2 as his purported response to Plaintiff's motion for default judgment.

Plaintiff moved for default judgment on October 14, 2022.  (*See* Dkt. No. 186.)  Responses were due by November 4, 2022.  *See* LCR 7(d)(3).  Mr. Bayley moved for relief from this deadline on November 14, 2022.  Mr. Bayley argues there is good cause for the Court to excuse this delay because he "was not aware [he] could file a response" and he did not receive Plaintiff's motion for default judgment (Dkt. No. 186) and accompanying declaration (Dkt. No. 187) until October 20, 2022, which caused him disadvantage.  (Dkt. No. 194 at 3, 5.)  Mr. Bayley also argues "[t]he interests of justice will be served by allowing [him] to submit [his response]."  (*Id.* at 5.)

Plaintiff argues there was no prejudice because Plaintiff emailed Mr. Bayley a copy of its motion the day Plaintiff filed it with the Court.[2]  (*See* Dkt. No. 200-1 at 2.)  Additionally, Mr. Bayley received notice via the CM/ECF system.  (*See* Dkt. Nos. 200-2 at 2; 200-3 at 2.)  (*See also* Dkt. No. 185) (Mr. Bayley registered to "receive service of documents and notice of electronic filings to [his] email via the Court's electronic filing system (CM/ECF).")

---

[2] Mr. Bayley argues Plaintiff sent its motion to the wrong email address (Dkt. No. 201 at 1), yet Plaintiff's counsel certifies she emailed bayley@outlook.com (Dkt. No. 200 at 1), which is the contact email address Mr. Bayley provided as a pro se litigant (Dkt. No. 181).  Mr. Bayley provides no evidence or reason to believe counsel sent the documents to a different email address—the Court is not persuaded by Mr. Bayley's argument that his "email address is not 'Philip Bayley' but bayley@outlook.com."  (Dkt. No. 202 at 1.)  Regardless, Mr. Bayley's argument is moot because he clearly received notice via CM/ECF and by mail, which he concedes.  (*See* Dkt. No. 202 at 1) ("[Mr. Bayley] did factually receive a USPS paper copy of her brief and exhibits[.]").

1  Under Local Civil Rule 55(b)(4), if the defaulting party has appeared, a motion for

2  default judgment and all papers filed in support of the motion must be served at the defaulting

3  party's address of record and shall also be served by electronic means if available.  Because the

4  particulars of when Mr. Bayley received a paper copy are unclear, the Court will accept Mr.

5  Bayley's late filed response to cure any potential prejudice.

6  That said, the Court does not find Mr. Bayley has been prejudiced as a pro se litigant nor

7  that the Court has shown bias against Defendants.  The examples of purported bias Mr. Bayley

8  raises in his motion are meritless.  First, Mr. Bayley asserts "three outside witnesses" claim the

9  Court showed favoritism to Plaintiff but does not explain how this purported favoritism

10  manifested.  (*See* Dkt. No. 195 at 1.)  Second, Mr. Bayley complains, even though the Court

11  considered his late filed response to Plaintiff's motion for sanctions, Plaintiff did not reply.  (*Id.*

12  at 2.)  A reply is not required for the Court to consider a motion.  *See* LCR 7(b)(3) ("The moving

13  party may . . . file with the clerk, and serve on each party that has appeared in the action, a reply

14  brief in support of the motion[.]")  Mr. Bayley fails to show any prejudice.

15  Although Mr. Bayley appears pro se, he is not immune from the rules of civil procedure.

16  "Pro se litigants must follow the same rules of procedure that govern other litigants" including

17  the Federal Rules of Civil Procedure and the Local Civil Rules of the Western District of

18  Washington.  *King v. Atiyeh*, 814 F.2d 565, 567 (9th Cir. 1987), *overruled on other grounds by*

19  *Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012).  *See also Jacobsen v. Filler,* 790 F.2d

20  1362, 1364 (9th Cir. 1986) ("Pro se litigants in the ordinary civil case should not be treated more

21  favorably than parties with attorneys of record.").

22

23

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

## III      DISCUSSION

### A.  Legal Standard

After entry of default, the Court may enter a default judgment.  Fed. R. Civ. P. 55(b).

The general rule on default is that well-pled allegations in the complaint about liability are

considered true.  *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002).  "The district

court's decision whether to enter a default judgment is a discretionary one."  *Aldabe v. Aldabe*,

616 F.2d 1089, 1092 (9th Cir. 1980).  In exercising its discretion, the Court considers these

factors:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's
> substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at
> stake in the action; (5) the possibility of a dispute concerning material facts; (6)
> whether the default was due to excusable neglect, and (7) the strong policy
> underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

### B.  Jurisdiction

Before entering default judgment, the Court must confirm that it has both subject matter

and personal jurisdiction.  *See In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999) ("When entry of

[default] judgment is sought . . . , a district court has an affirmative duty to look into its

jurisdiction over both the subject matter and the parties.").

The Court has confirmed subject matter jurisdiction over Plaintiff's CWA claims in its

order denying Defendants' motion for reconsideration.  (*See* Dkt. No. 204.)  Subject matter

jurisdiction also exists over Plaintiff's fraudulent/voidable transfer and wrongful distribution of

assets claims, brought under 28 U.S.C. § 3304 and 31 U.S.C. § 3713 respectively, as both raise a

federal question.  *See* 28 U.S.C. § 1331.  District courts have original jurisdiction over "all civil

actions, suits or proceedings commenced by the United States, or by any [United States] agency"

1  and over "any action or proceeding for the recovery or enforcement of any fine, penalty, or

2  forfeiture . . . incurred under any Act of Congress."  *See* 28 U.S.C. § 1345; 28 U.S.C. § 1355(a).

3  The Court has personal jurisdiction over Defendants.  Mr. and Ms. Bayley are residents

4  of Washington, and Big D's is a limited liability company registered in the state of Washington.

5  (Dkt. No. 1 at 2–3.)

6  **C.  *Eitel* Factors**

7  Six *Eitel* factors support granting default judgment against Defendants for their CWA

8  violations, fraudulent/voidable transfer, and wrongful distribution of assets.  Only one factor

9  weighs against default judgment.

10  Factor 1: Prejudice to Plaintiff

11  "[P]rejudice exists where the plaintiff has no recourse for recovery other than default

12  judgment."  *Getty Images (US), Inc. v. Virtual Clinics*, No. C13-0626JLR, 2014 WL 358412, at

13  *3 (W.D. Wash. Jan. 31, 2014) (internal quotation marks and citation omitted).  Plaintiff will

14  face prejudice absent default judgment because "this litigation is [Plaintiff's] only pathway to a

15  civil penalty and mitigation for Defendants' CWA violations[.]"  (Dkt. No. 186 at 3.)  Thus, the

16  first *Eitel* factor favors default judgment.

17  Factors 2 and 3: Merits of Plaintiff's Claims and Sufficiency of Complaint

18  The second and third *Eitel* factors are generally considered together.  *See Curtis v.*

19  *Illumination Arts, Inc.*, 33 F. Supp. 3d 1200, 1211 (W.D. Wash. 2014).  Because Plaintiff

20  sufficiently alleges the claims in its complaint, the second and third *Eitel* factors point to default

21  judgment.

22

23

24

1

> *i.   CWA Claims*

2

The CWA prohibits discharging pollutants into navigable waters unless authorized by

3

permit.  *See* 33 U.S.C. § 1311(a); 33 U.S.C. § 1344(a), (d).  To establish a violation of the CWA,

4

Plaintiff must prove Defendants are (1) persons responsible for (2) adding dredged or fill

5

material (3) from a point source (4) to waters of the United States (5) without a permit.  *United*

6

*States v. Sweeney*, 483 F. Supp. 3d 871, 908 (E.D. Cal. 2020) (citing 33 U.S.C. §§ 1311(a), 1344,

7

1362(6), (7), (12)(A), (14)).

8

First, Defendants are "persons" as defined by the CWA.  The term "person" includes any

9

individual, corporation, or partnership.  33 U.S.C. § 1362(5).  Mr. and Ms. Bayley and Big D's

10

qualifies as persons.  A trustee is an individual even when acting as a trustee.  Thus, Mr. Bayley

11

acting as trustee of Frihet Trust qualifies as a person under the CWA.  *See United States v.*

12

*Brittain*, 931 F.2d 1413, 1418–19 (10th Cir. 1991) (holding a public utility director, as an

13

"individual," was a "person" subject to criminal liability under the CWA).

14

"[T]he CWA imposes liability both on the party who actually performed the work and on

15

the party with responsibility for or control over performance of the work."  *Puget Soundkeeper*

16

*All. v. Cruise Terminals of Am., LLC*, 216 F. Supp. 3d 1198, 1223 (W.D. Wash. 2015) (quoting

17

*Assateague Coastkeeper v. Alan & Kristin Hudson Farm*, 727 F. Supp. 2d 433, 442 (D. Md.

18

2010)).  All Defendants are subject to liability.  Mr. Bayley and Ms. Bayley paid some expenses

19

incurred in constructing the bulkhead from their personal accounts.  (Dkt. No. 1 at 6.)  Big D's

20

owned the Site at the time of the 2017 bulkhead construction and thus had control over the

21

performance of the work.  (*Id.*)  Mr. Bayley, in his capacity as trustee of Frihet Trust, directed

22

construction in 2020 which resulted in additional CWA violations.  (*Id.* at 9.)

23

24

Second, Defendants added pollutants.  Under the CWA, "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source[.]"  33 U.S.C. § 1362(12)(A).  "The term 'pollutants' includes dredge or fill material."  *Alaska Ctr. for the Env't v. West*, 157 F.3d 680, 682 (9th Cir. 1998).[3]  The discharge or addition of fill material generally includes "property protection and/or reclamation devices such as riprap, groins, seawalls, breakwaters, and revetment."  33 C.F.R. § 323.2(f).

In August 2017, Plaintiff alleges Ms. Bayley, Mr. Bayley, and Big D's, or persons acting on their behalf, "used heavy earthmoving equipment, such as an excavator and trucks, to remove old bulkhead material and to construct a vertical concrete bulkhead[,]" which discharged into Hood Canal dredged or fill material, such as dirt, spoil, rock, sand, and concrete.  (Dkt. No. 1 at 4–5.)  In August 2020, Mr. Bayley "individually and as a trustee of Frihet Trust," or persons acting on his behalf, allegedly "used equipment to discharge concrete and other fill material in Hood Canal" to construct a stairway adjacent to the bulkhead and to fill the shoreline behind the concrete bulkhead.  (*Id.* at 9.)  The discharged dredged or fill material included "dirt, spoil, rock, sand, and concrete," which qualify as pollutants.  *Id.*

Third, Defendants used pieces of equipment that qualify as point sources.  The CWA defines point sources as "any discernible, confined[,] and discrete conveyance[.]"  33 U.S.C.

---

[3] The following statutory and regulatory definitions confirm pollutants included dredge or fill material.  "The term 'pollutant' means dredged spoil, . . . rock, sand, cellar dirt and [garbage]."  33 U.S.C. § 1362(6).  "The term dredged material means material that is excavated or dredged from waters of the United States."  33 C.F.R. 323.2(c).  *See also* 33 C.F.R. 323.2(e)(1)–(2):

> [T]he term fill material means material placed in waters of the United States where the material has the effect of: (i) [r]eplacing any portion of a water of the United States with dry land; or (ii) [c]hanging the bottom elevation of any portion of a water of the United States[,] [including] rock, sand, soil, clay, plastics, construction debris, wood chips, overburden from missing or other excavation activities, and materials used to create any structure or infrastructure in the waters of the United States.

§ 1362(14).  "The concept of a point source embraces 'the broadest possible definition of any

identifiable conveyance from which pollutants might enter waters of the United States[,]'"

including "bulldozers, backhoes, draglines, and other earthmoving equipment."  *United States v.*

*Lambert*, 915 F. Supp. 797, 805 n. 8 (S.D.W. Va. 1996) (quoting *United States v. Earth Sciences,*

*Inc.,* 599 F.2d 368, 373 (10th Cir.1979)).  *See, e.g.*, *Borden Ranch P'ship v. U.S. Army Corps of*

*Engineers*, 261 F.3d 810, 815 (9th Cir. 2001), *aff'd*, 537 U.S. 99, (2002) (holding bulldozers and

tractors qualify as point sources under the CWA).  Plaintiff alleges Defendants used, or directed

others to use, heavy earthmoving equipment, such as an excavator and trucks, to remove old

bulkhead material and construct a concrete bulkhead in 2017.  (Dkt. No. 1 at 4.)  Plaintiff further

alleges Mr. Bayley, individually and as trustee of Frihet Trust, directed contractors to use

equipment to build a stairway adjacent to the concrete bulkhead and "fill the shoreline behind the

concrete bulkhead" in 2020.  (*Id.* at 9.)

Though not appearing necessary given the sufficiency of the Complaint, Plaintiff submits

evidence supporting its allegations with its motion for default.[4]  Plaintiff cites photographs taken

by neighbors at a property directly east of the Site to show "cement trucks discharged concrete

into forms for the bulkhead in 2017 and stairs in 2020."  (Dkt. No. 186 at 6) (citing Dkt. No.

186-2 at 18, 28.)  Plaintiff also cites photographs taken by neighbors showing an excavator

---

[4] Some courts have held assessment of liability on default judgment must be limited to the four
corners of the complaint.  *See Ayers v. Receivables Performance Mgmt., L.L.C.*, No. 2:15-CV-
12082, 2016 WL 5402962, at *5 (E.D. Mich. Sept. 28, 2016) (collecting cases).  These courts have
reasoned "a defendant should be able to review a complaint, and, if it is confident that the
complaint fails to state a claim for relief, elect to conserve its resources and not defend the case."
*Id.*  In *Ayers*, the district court considered extrinsic evidence appropriate because defendants were
served a copy of the plaintiff's motion for default judgment and could have responded.  *Id.*  Here,
Plaintiff certifies it electronically served a copy of its motion for default judgment to all Defendants
and also served Mr. Bayley in his individual capacity by email and mail service.  (Dkt. No. 186 at
25.)  The Court therefore finds it appropriate to consider extrinsic evidence.

ORDER GRANTING PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT (DKT. NO. 186) - 11

discharging dirt between the bulkhead and the bank in 2020.  (*Id.*) (citing Dkt. No. 186-2 at 22, 24, 26.)

Fourth, Defendants' discharged pollutants into waters of the United States.  In the Ninth Circuit, courts apply the regulatory definition in place at the time of the defendant's conduct to delineate "waters of the Untied States."  *Sackett v. U.S. Env't Prot. Agency*, 8 F.4th 1075, 1091 (9th Cir. 2021), *cert. granted in part*, 211 L. Ed. 2d 604 (2022).  In August 2017 and August 2020, the term "waters of the United States" included  "waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide."  33 C.F.R. § 328.3(a)(1).[5]  For tidal waters, regulatory jurisdiction ends at the high tide line.  33 C.F.R. § 328.4(b)(1).  High tide line means:

> The term high tide line means the line of intersection of the land with the water's surface at the maximum height reached by a rising tide. The high tide line may be determined, in the absence of actual data, by a line of oil or scum along shore objects, a more or less continuous deposit of fine shell or debris on the foreshore or berm, other physical markings or characteristics, vegetation lines, tidal gages, or other suitable means that delineate the general height reached by a rising tide. The line encompasses spring high tides and other high tides that occur with periodic frequency but does not include storm surges in which there is a departure from the normal or predicted reach of the tide due to the piling up of water against a coast by strong winds, such as those accompanying a hurricane or other intense storm.

33 C.F.R. § 328.3(c)(4).[6]

Plaintiff alleges Hood Canal has been and is used in interstate and foreign commerce.  (Dkt. No. 1 at 4.)  Hood Canal is subject to the ebb and flow of the tide.  (*Id.*)  Plaintiff alleges

---

[5] *See* The Navigable Waters Protection Rule: Definition of "Waters of the United States," 85 Fed. Reg. 22,250 (Apr. 21, 2020); *see also* Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg. 37,054 (June 29, 2015).

[6] The definition of high tide line was the same in August 2017 and August 2020.  *See* The Navigable Waters Protection Rule: Definition of "Waters of the United States," 85 Fed. Reg. 22,250 (April 21, 2020); *see also* Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg. 37,054 (June 29, 2015).

Defendants' discharges occurred below the high tide line of Hood Canal.  (*Id.* at 5, 9.)  Plaintiff also cites tidal data and field indicators to support its contention that the bulkhead construction occurred below the high tide line.  (Dkt. No. 186 at 6–7) (citing Dkt. No. 186-3 at 21–22).  EPA Regional Wetland Coordinator, Amy Jensen, attests "[f]ield indicators . . . that have developed on the new bulkhead since its construction, including the presence of encrusted barnacles, persistent water marks, small debris accumulation, algae growth, and direct observation of inundation support [the] determination" that Defendants' discharges occurred below the high tide line.  (Dkt. No. 186-3 at 22.)

Fifth, Plaintiff satisfies the final element of a CWA claim by alleging Defendants did not obtain a Section 404 permit.  (Dkt. No. 1 at 5, 9.)  As a result, Plaintiff has sufficiently alleged two CWA claims.

### ii.   Fraudulent/Voidable Transfer Claim

Under the Federal Debt Collection Procedures Act (FDCPA), the federal government may void a fraudulent transfer by a debtor owing a debt to the United States.  *U.S. Small Bus. Admin. v. Bensal*, 853 F.3d 992, 996–97 (9th Cir. 2017).  The FDCPA provides several ways to show a transfer is fraudulent.  If the debt arises before the transfer, the transfer is fraudulent if "the debtor makes the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer" and "the debtor becomes insolvent as a result of the transfer or obligation[.]"  28 U.S.C. § 3304(a)(1)(A)–(B).  Additionally, even if the debt arose before or after the transfer, the transfer is fraudulent if "the debtor makes the transfer . . . with actual intent to hinder, delay, or defraud a creditor[.]"  28 U.S.C. § 3304(b)(1)(A).  In determining "actual intent," courts may consider eleven factors identified by statute, including whether "the transfer . . . was to an insider[,]"  "the debtor retained possession or control of the property transferred after the

transfer[,]" the transfer was concealed, the debtor had been sued or threatened with suit before making the transfer, "the transfer was of substantially all the debtor's assets[,]" "the value of the consideration received was reasonably equivalent to the value of the asset transferred[,]" and whether the debtor "became insolvent shortly after the transfer was made[.]"  *See* 28 U.S.C. § 3304(b)(2)(A)–(K).

Plaintiff alleges the "EPA sent a Notice of Violation informing Defendants that [the 2017] construction of the bulkhead violated the CWA" on July 26, 2018, before Ms. Bayley and Mr. Bayley "disbursed the assets of [Big D's] without making provisions for the payment of creditors of [Big D's], or for its liabilities for violating the [CWA]" on December 13, 2019. (Dkt. No. 1 at 6.)  Plaintiff further alleges "[p]rior to December 13, 2019, EPA and U.S. Army Corps of Engineers gave Defendants notice of the violations of the [CWA] on the Site, and EPA requested that the violations be remedied, or the United States would initiate an enforcement action." (Dkt. No. 1 at 8.)  Plaintiff argues it has "credibly alleged and substantiated that [] Defendants' debt to the United States began accruing with the CWA violations in 2017 before the December 2019 transfers of the Property[.]" (Dkt. No. 186 at 7.)  The Court agrees.  Plaintiff adequately alleges the remaining elements of a fraudulent transfer under 28 U.S.C. § 3304(a)(1)(A)–(B): Big D's received no payment from Ms. Bayley (Dkt. No. 1 at 7); Ms. Bayley received no payment from Mr. Bayley as trustee of Frihet Trust (*id.* at 7); and Big D's became insolvent as a result of the transfer such that it cannot satisfy its obligations under the CWA (*id.* at 8).

Alternatively, Plaintiff adequately alleges a fraudulent transfer under 28 U.S.C. § 3304(b)(1)(A).  Big D's transferred the Site to insiders who kept control of the Site in Defendants' hands under the looming threat of an enforcement action for no valuable

consideration which rendered Big D's insolvent.  (*See* Dkt. No. 1 at 6–8.)  Thus, Plaintiff shows

Defendants acted with intent to hinder, delay, or defraud a creditor and Plaintiff alleged a

voidable fraudulent transfer.[7]

### iii.    Wrongful Distribution of Assets

Under the federal priority statute, a "claim of the United States Government shall be paid

first when . . . a person indebted to the Government is insolvent and . . . an act of bankruptcy is

committed." 33 U.S.C. § 3713(a)(1)(A)(iii).  An act of bankruptcy includes committing a

fraudulent conveyance.  *See United States v. Mr. Hamburg Bronx Corp.*, 228 F. Supp. 115, 121

(S.D.N.Y. 1964) (holding the debtor "committed an act of bankruptcy by fraudulently

transferring its assets so as to conceal them from its creditors" while insolvent).

Plaintiff alleges when Big D's was dissolved, Mr. and Ms. Bayley distributed its assets,

without paying or providing for payment of claims and obligations resulting from violations of

the CWA at the Site even though Big D's Beach Cabin, LLC had knowledge or notice of the

United States CWA claims.  (Dkt. No. 1 at 8–9).  Because Big D's is now insolvent and

committed an act of bankruptcy, Plaintiff sufficiently alleges a violation of the federal priority

statute.  Given Big D's is the only party alleged to be insolvent, Big D's is the only violator of

the federal priority statute.

Factor 4: Sum of Money at Stake

Plaintiff asks the Court to order Defendants to make a compensatory mitigation payment

of $33,492.10 to the Hood Canal Coordinating Council's In-Lieu Fee Program.  (Dkt. No. 186-1

---

[7] Plaintiff's complaint also cites the Revised Code of Washington §§ 19.40.081 and 25.15.305.
But Plaintiff raises neither provision in its motion for default judgment.  Thus, the Court does not
consider Plaintiff's claims, if any, under the Revised Code of Washington §§ 19.40.081 and
25.15.305.

at 2.)  Plaintiff also asks the Court to levy a civil penalty of $250,000 with Mr. Bayley as trustee of Frihet Trust paying $115,750, Mr. Bayley individually paying $80,550, Ms. Bayley paying $26,850, and Big D's paying $26,850.  (*Id.*)  The sum of money at stake is reasonable given Plaintiff's allegations.  (*See infra* Part III Sections D–E) (discussing the appropriate equitable relief and civil penalty).  Thus, the fourth *Eitel* factor supports default judgment.

<u>Factors 5 and 6: Possibility of Dispute of Material Facts and Whether Default is Due to Excusable Neglect</u>

Because the Court entered default against Defendants, all well-pled facts in the complaint are taken as true as to liability.  Plaintiff supports its claims for damages with evidence, which Defendants fail to rebut.  There is no indication of excusable neglect on Defendants' part.  Indeed, the Court held Defendants' discovery misconduct was willful and in bad faith.  (*See* Dkt. No. 182 at 17.)  Accordingly, the fifth and sixth *Eitel* factors favor default judgment.

<u>Factor 7: Public Policy Favoring Decisions on the Merits</u>

The last *Eitel* factor weighs against entry of default judgment given the courts' strong preference to resolve claims on the merits.  Still, this single factor is outweighed by the preceding six factors that all favor entry of default judgment.

**D.  Equitable Relief**

In civil actions, the CWA authorizes "appropriate relief, including a permanent or temporary injunction, for any violation[.]"  33 U.S.C. § 1319(b).  District courts may order restoration "to effectuate the stated goals of the Clean Water Act 'to maintain the chemical, physical, and biological integrity of the Nation's waters[.]'"  *United States v. Cumberland Farms of Connecticut, Inc.*, 826 F.2d 1151, 1164 (1st Cir. 1987) (citing 33 U.S.C. § 1251).  "In evaluating remediation or restoration proposals, courts have considered three factors: (1) whether the proposal would confer maximum environmental benefits, (2) whether it is achievable as a

practical matter, and (3) whether it bears an equitable relationship to the degree and kind of

wrong it is intended to remedy." *United States v. Deaton*, 332 F.3d 698, 714 (4th Cir. 2003)

(internal quotation marks omitted).

Although restoration of a violation site is the preferred remedy, if restoration is not

feasible, a court may order compensatory mitigation. *See Foster v. EPA*, No. 14-16744, Dkt. No.

264 at 3–5 (S.D. W. Va. Aug. 29, 2019). "Compensatory mitigation can be accomplished in one

of three ways: 1) mitigation banks, 2) in-lieu fee programs, or 3) permittee-responsible

mitigation[.]" *Walther v. United States*, No. 3:15-CV-0021-HRH, 2015 WL 6872437, at *2 (D.

Alaska Nov. 9, 2015). *See also* Compensatory Mitigation for Losses of Aquatic Resources, 73

Fed. Reg. 19594-01, 2008 WL 954371 (Apr. 10, 2008).

In this case, Plaintiff seeks equitable relief because the "bulkhead has caused irreparable

harm to Hood Canal." (Dkt. No. 186 at 10.) Dr. Lyndon Lee, ecosystems ecologist and

regulatory expert (Dkt. No. 186-4 at 8) visited the Site on March 12, 2021 to conduct

measurements and document shoreline conditions (Dkt. No. 186-2 at 22–-23). Dr. Lee found the

vertical bulkhead permanently adversely changed the patterns of tidal water flow, circulation,

and wave reflection along the shoreline. (Dkt. No 186-4 at 15–16.) Dr. Lee further found an

increased pH in water that encountered the vertical bulkhead, which can kill or injure fish

including the endangered Chinook salmon. (Dkt. No. 186-4 at 16–17.) Dr. Lee stated:

> [I]nstallation of the new vertical bulkhead allowed the Defendants to gain
> approximately 334.1 [square feet] of useable, now upland area behind (south of)
> the new bulkhead. In my opinion, it is questionable whether the Corps – Seattle
> District, in consultation with [National Marine Fisheries Service] for Endangered
> Species Act issues would have permitted a project with these types of direct impacts
> in listed habitats for endangered species. If they did, it is my further opinion that
> the Corps would have required significant avoidance and minimization of impacts
> on-site, coupled with significant compensatory mitigation of impacts off-site."

(*Id.* at 15.)

In this case, compensatory mitigation is the appropriate form of relief.  Dr. Lee found restoration of the Site is not feasible, so it would not confer the maximum environmental benefit. (*See id.* at 22.)  Dr. Lee stated:

> Removal of the new bulkhead without replacement, with a structure that resembles the old revetment, or soft shoreline stabilization solutions are either impracticable or impossible, risky, expensive, and if undertaken, will not yield the environmental benefits needed to restore lost ecosystem structure and functions.

(*Id.*)  The best action environmentally is "mitigation of direct, indirect, cumulative, and temporal impacts off-site from the Defendants' Property." (*Id.*)

Compensatory mitigation is achievable as a practical matter.  To be achievable, the ordered relief must be cost effective and feasible.  *United States v. Ciampitti*, 615 F. Supp. 116, 123 (D.N.J. 1984).  Plaintiff asserts there is no mitigation bank for Hood Canal so an in-lieu fee mitigation program is appropriate.  (*See* Dkt. No. 186 at 12–13.)  The largest in-lieu fee mitigation program in the Hood Canal service area is administered by the Hood Canal Coordinating Council (HCCC).  (Dkt. No. 186-4 at 22.)  Plaintiff asks the Court to order Defendants to jointly pay compensatory mitigation to the HCCC's In-Lieu Fee Program.  (Dkt. No. 186 at 10.)  Payment to this in-lieu fee program is appropriate and feasible.

Plaintiff asks the Court to order Defendants to pay $33,492.10.[8]  (Dkt. No. 186 at 14.) Dr. Lee uses the HCCC "Marine-Nearshore Interim Calculator" to assess the impact on the Site and finds the total cost to be $33,492.10 had Defendants purchased mitigation credits from HCCC as a part of receiving a Section 404 permit.  (Dkt. No. 186-4 at 22–23.)  Thus, the amount bears an equitable relationship to the degree and kind of wrong Defendants committed in

---

[8] Plaintiff appears to invert the end digits of the payment amount.  In its motion, Plaintiff seeks $33,492.10 but Dr. Lee's report finds costs to equal $33,492.10.  (Dkt. No. 186-4 at 23.)  The Court thus uses the number from Dr. Lee's report.

violating the CWA.  The Court orders Defendants to pay HCCC's In-Lieu Fee Program $33,492.10.  Defendants are joint and severally liable for this amount.

### E.  Civil Penalty Under the CWA

"Any person who violates [the CWA] . . . shall be subject to a civil penalty not to exceed $64,618[9] per day for each violation." 33 U.S.C.A. § 1319(d).  "If a district court finds a violation, then civil penalties under 33 U.S.C. § 1319(d) are mandatory." *Nat. Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 1001 (9th Cir. 2000).  "A district court has discretion to set the amount of a penalty (up to the statutory maximum)[.]" *Id.*

"In determining the amount of a civil penalty[,] the court shall consider [(1)] the seriousness of the violation or violations, [(2)] the economic benefit (if any) resulting from the violation, [(3)] any history of such violations, [(4)] any good-faith efforts to comply with the applicable requirements, [(5)] the economic impact of the penalty on the violator, and [(6)] such other matters as justice may require." 33 U.S.C. § 1319(d).  In calculating a penalty, courts employ a variety of methods including a top-down and bottom-up approaches.  The top-down approach "calculates the maximum penalty allowed by the CWA and then adjusts downward based on the statutory penalty factors[.]" *Californians for Alternatives to Toxics v. Kernen Constr. Co.*, No. 4:20-CV-01348 YGR, 2021 WL 1734897, at *3 (N.D. Cal. May 2, 2021).  The bottom-up approach "begins by calculating the economic benefit of noncompliance and then adjusts upward based on the statutory penalty factors[.]" *Id.*

---

[9] The maximum statutory civil penalty per day, per violation under the CWA when it was enacted was $25,000.  It has been adjusted for inflation. *See* 40 C.F.R. § 19.4, Table 1 setting out statutory civil monetary penalty provisions of statutes administered by the EPA including 33 U.S.C. § 1319(d) for "violations that . . . occurred after November 2, 2015, where penalties are assessed on or after January 6, 2023.

In this case, the maximum penalty is $258,472.[10]  Plaintiff argues and supports with evidence that Defendants have collectively committed four distinct CWA violations: (1) installing supports to construct the bulkhead in 2017, (2) pouring concrete into forms in 2017, (3) constructing stairs on the bulkhead in 2020, and (4) backfilling behind the bulkhead in 2020. Each violation carries a maximum penalty of $64,618.  *See Borden Ranch P'ship v. U.S. Army Corps of Eng'rs*, No. S:97-cv-858-GEB-JFM, 1999 WL 1797329, at *21 (E.D. Cal. Nov. 8, 1999), *aff'd in relevant part*, 261 F.3d 810 (9th Cir. 2001).  Plaintiff asks the Court to order Defendants pay a total civil penalty of $250,000.

    1.    The Seriousness of Defendants' Violations

In considering the seriousness of the defendant's conduct, courts consider the number and continuous nature of the CWA violations.  *Id.* at *16.  Courts may consider "(1) the number of violations; (2) the duration of noncompliance; (3) the significance of the violation (degree of exceedance and relative importance of the provision violated); and (4) the actual or potential harm to human health and the environment."  *Hawaii's Thousand Friends v. City & Cnty. of Honolulu*, 821 F. Supp. 1368, 1383 (D. Haw. 1993).

Here, Defendants committed at least four violations over the course of around three years.  During that period, Defendants failed to heed several warnings from the Army Corps of

---

[10] Plaintiff argues the maximum penalty is $323,134,524. (Dkt. No. 186 at 15.)  Although Plaintiff does not explain its basis, the Court surmises Plaintiff arrived at this amount by multiplying the four violations times the maximum amount for each day since the discharge occurred until Plaintiff moved for default judgment.  Plaintiff cites *Sasser v. EPA*, 990 F.2d 127, 129 (4th Cir. 1993), which states, "[e]ach day the pollutant remains in the wetlands without a permit constitutes an additional day of violation."  *But see Borden Ranch P'ship*, 1999 WL 1797329, at *15 ("[T]he day on which a discharge occurred is the only day that will be counted in determining the maximum penalty").  The case law in the Ninth Circuit appears unsettled on this point.  Because Plaintiff requests a penalty below the maximum amount the Court calculates, the Court does not consider whether each day since the discharge occurred is a day counted toward the maximum penalty.

1 Engineers that notified Defendants of their CWA obligations.  Discharging dredged or fill

2 material into the Hood Canal without applying for a Section 404 strikes at the heart of the

3 CWA's mission to "maintain the chemical, physical, and biological integrity of the Nation's

4 waters[.]'" *See* 33 U.S.C. § 1251.  Plaintiffs have evidenced harm to the environment resulting

5 from Defendants noncompliance, including increased pH levels and permanent, adverse changes

6 the patterns of tidal water flow, circulation, and wave reflection along the shoreline.  (Dkt. No.

7 186-4 at 15–17.)  Defendants' violations were serious.

8      2.  The Economic Benefit Gained Through Defendants' Violations

9      Plaintiff argues Defendants should be prevented from profiting from their wrongdoing

10 and gain an unfair competitive advantage over those who complied with the CWA.  (Dkt. No.

11 186 at 17) (citing *United States v. Mun. Auth. of Union Twp.*, 150 F.3d 259, 263 (3d Cir. 1998).

12 "Unless a violator is penalized in an amount greater than the economic gain resulting from its

13 noncompliance with the Act, the penalty serves little deterrent value."  (*Id.*)

14      First, in failing to apply for a permit, Defendants saved $4,400 on permitting costs.  (*See*

15 Dkt. No. 186 at 18.)  Mr. Bayley appears to agree permitting costs would be $4,400.  (*See* Dkt.

16 No. 195-2 at 21.)

17      Second, "[b]y replacing their existing sloped revetment with a vertical bulkhead,

18 Defendants were able to increase the size of the uplands portion of the Site by approximately 334

19 square feet[,]" which in turn allowed Defendants to build a house with 570 square feet of

20 additional living area over three levels.  (Dkt. No. 186 at 18–19) (citing Dkt. Nos. 187-1 at 385;

21 186-4 at 14–15).  Based on Mason County's $445,434.99 assessed value (Dkt. No. 187-1 at 385)

22 for Defendants 3,003 square-foot house (*id.* at 395), the value of each square foot is about

23 $148.33.  (*See* Dkt. No. 186 at 20.)  As Plaintiff explains, "the expanded footprint resulted in an

24

additional value of at least $84,500," or the product of $148.33 multiplied by 570 square feet. (*Id.*)  Accordingly, Plaintiff asks the Court to level a civil penalty equivalent to around three times the benefit gained.

### 3.  Defendants' History of Violations

Plaintiff argues "[t]he nature of Defendants' violations here shows that they blatantly flouted the CWA's regulatory scheme."  (Dkt. No. 186 at 20.)  On August 11, 2017, shortly after bulkhead construction started, Army Corps of Engineers employee Jason Sweeney emailed Mr. Bayley stating the project appeared to violate the CWA.  (Dkt. Nos. 1 at 6; 187-1 at 324.)  On August 17, 2017, USACE ordered work on the bulkhead stop.  (Dkt. No. 1 at 6.)  On July 26, 2018, the EPA sent a Notice of Violation.  (Dkt. Nos. 1 at 6; 187-1 at 330.)  Despite these warnings, Mr. Bayley, as an individual and trustee of Frihet Trust, directed the construction of concrete stairs and fill landward of the bulkhead in August 2020.  Defendants repeat violations support a civil penalty beyond the economic benefit gained through unlawful conduct.

### 4.  Defendants' Good Faith Efforts to Comply with the CWA

Mr. Bayley's actions individually and as trustee of Frihet Trust do not show any good faith efforts to comply with the CWA.  Although Mr. Bayley obtained approval from Mason County for the project, he took no steps to comply with federal law.  The facts do not show good faith efforts by Ms. Bayley or Big D's.  Thus, Mr. Bayley's argument that he took good faith steps to comply by obtaining state approval do not justify a reduced penalty.

### 5.  The Penalty's Economic Impact on Defendants

Because Defendants refused to respond to financial discovery requests, the Court ordered Defendants' ability to pay an appropriate CWA penalty be taken as established.  (Dkt. No. 182 at 24.)  Mr. Bayley argues his gross income has been $20,000 per year for the last six years.  (Dkt.

No. 195 at 7.)  He also asserts Ms. Bayley is 78 years old with increased living costs and makes

no income.  (*Id.*)  These arguments are not considered by the Court, given that Defendants

willfully refused to comply with six discovery orders leading the Court to sanction Defendants

by taken their ability to pay as established.  Mr. Bayley also argues any civil penalty was

discharged when he declared bankruptcy.  (Dkt. No. 195 at 6.)  However, Mr. Bayley does not

provide legal authority to support his contention that a civil penalty under the CWA would be

subject to discharge.  *See* 11 U.S.C. § 523(a)(7) (exempting from discharge fines and penalties

owed to the United States).

6.   The $250,000 Penalty is Just Under the Circumstances

Plaintiff asks that the civil penalty be allotted as follows: (1) Mr. Bayley in his capacity

as trustee of Frihet Trust: $115,750; (2) Mr. Bayley in his individual capacity: $80,550; (3) Ms.

Bayley: $26,850; and (4) Big D's: $26,850.  (Dkt. No. 186 at 24.)  Given that Frihet Trust, as the

Site property owner, accrued the economic benefit of $88,900, that portion of the penalty is

apportioned to Mr. Bayley in his capacity as trustee.  Subtracting $88,900 from $250,000 equals

$161,100.  Plaintiff argues half should be charged against Mr. Bayley in his individual capacity.

Because Mr. Bayley directed most of the construction leading to unlawful discharges, it is

appropriate that he bear the largest portion of the penalty.  The remaining penalty should be

apportioned equally between Ms. Bayley, Big D's, and Mr. Bayley as trustee of Frihet Trust.

**F.  Mr. Bayley's Arguments**

The Court now addresses the arguments in Mr. Bayley's response not previously

discussed.  As a threshold matter, the Court notes many of Mr. Bayley's arguments address

Plaintiff's allegations about Defendants' liability.  Because the Court has entered default against

Defendants, Plaintiff's factual allegations are taken as true, except for those relating to damages.

Mr. Bayley cannot present argument or evidence against Plaintiff's well-pled claims. Thus, the Court does not consider Mr. Bayley's argument that the CWA does not extend to non-point sources—Defendants' alleged discharged occurred from point sources. Nor does the Court consider Mr. Bayley's argument that the bulkhead construction occurred "100% within its uplands" not navigable waters—the alleged construction occurred below the high tide line. Mr. Bayley argues the transfers on December 13, 2019, were taken for estate planning purposes, however, Plaintiff has adequately alleged they were fraudulent transfers.

Mr. Bayley argues the Court should strike all evidence based on Plaintiff's criminal trespass. Mr. Bayley contends "Mr. Lee's report used data gained through an illegal search and seizure and [Washington state] criminal trespass[.]" (Dkt. No. 195-2 at 30.) Mr. Bayley also objects to any report by Jim Johannessen, Amy Jensen, Kent Hanson, and Patrick Johnson, who, with Mr. Lee, allegedly criminally trespassed into Frihet Trust's private property without permission on March 12, 2021 to complete reconnaissance and measurements at the Site. (Dkt. No. 195-2 at 25.) The Court provides no opinion on the veracity of Mr. Bayley's statements. Regardless, Mr. Bayley identifies no authority indicating the Court is precluded from considering the evidence obtained in this civil proceeding.

Next, Mr. Bayley argues Plaintiff has admitted all allegations made in Defendants' motion for summary judgment (Dkt. No. 119) by failing to timely respond. But if a party fails to oppose a motion for summary judgment, the Court may not consider such failure as an admission that the motion has merit. *See* Local Civil Rule 7(b). Moreover, the Court extended the briefing

1   schedule for Defendants' summary judgment motion by adopting a staggered briefing

2   schedule.[11]

3         Mr. Bayley argues Plaintiff committed perjury in the parties' joint status report ("JSR")

4   (Dkt. No. 105) because Defendants did not receive any settlement offers after Plaintiff filed its

5   complaint. (Dkt. No. 195 at 9.)  In the JSR, Plaintiff's stated position on prompt case resolution

6   is that it "repeatedly expressed interest in finding a negotiated solution in this case" but

7   "Defendants have not engaged in settlement discussions." (Dkt. No. 105 at 5.)  Nothing in this

8   statement suggests a settlement offer was made after filing the complaint; the Court finds no

9   inconsistency.  Mr. Bayley also argues Plaintiff's counsel committed perjury but does not

10  identify specific untrue statements.  Instead, he asserts there are "factual undisputable facts in

11  front of the Court that prove no CWA violations occurred by the authorized Bayley bulkhead

12  replacement project" and counsel has engaged in some kind of new bulkhead strawman

13  discovery default scheme. (Dkt. No. 195-2 at 80.)  As the Court stated in its order granting

14  sanctions, Mr. Bayley's allegations are utterly unsubstantiated and unworthy of consideration.

15        Finally, Mr. Bayley argues a CWA penalty should not exceed $4,400, the cost of an after-

16  the-fact permit, plus $300 because that was the mitigation required of an adjacent property

17

---

18  [11] Before the Court ruled on Defendants motion to dismiss, both Plaintiff and Defendant filed
    motions for summary judgment. (*See* Dkt. Nos. 37, 55.)  In its order denying Defendants' motion
19  to dismiss, the Court adopted a briefing schedule for the parties' cross motions for summary
    judgment. *See* LCR 7(h).  The Court ordered the parties to supplement their motions for summary
20  judgment (Dkt. Nos. 37, 55) no later than April 11, 2022 and re-noted cross motions for
    consideration on May 6, 2022. (Dkt. No. 104 at 10.)  Because Defendants failed to provide
21  discovery responses, the Court extended the deadline for summary judgment motions and cross
    motions to May 16, 2022 and June 10, 2022, respectively. (Dkt. No. 121.)  Before any of these
22  deadlines materialized, Defendants filed a new motion for summary judgment on April 5, 2021.
    (Dkt. No. 119).  To clarify deadlines, the Court held a telephonic hearing on May 3, 2022 to set a
23  new staggered briefing schedule that included Defendants' newly filed summary judgment motion
    (Dkt. No. 119). (Dkt. No. 127.)  Because the Court altered the briefing schedule, Plaintiff did not
24  fail to timely oppose Defendants' motion for summary judgment.

ORDER GRANTING PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT (DKT. NO. 186) - 25

owner.  (Dkt. No. 195 at 8.)  "Plaintiff authorized [Mr. Bayley's neighbor's] project and gave her an 'after-the-fact-CWA permit' and calculated the environmental costs . . . 14 yards of gravel or roughly $300 of gravel."  (*Id.*)  The Court finds this argument irrelevant as the penalty of Defendants' neighbors is not at issue.

### G.  Writ of Execution

Plaintiff asks the Court to authorize a writ of execution against the Site "in the event that one or more Defendants do not satisfy their liabilities."  (Dkt. No. 186 at 23.)  Plaintiff argues "[s]uch relief is proper here to satisfy the liabilities of Big D's, Ms. Bayley, and Mr. Bayley in his capacity as [t]rustee of Frihet Trust, because these Defendants defrauded the United States by transferring the Site to avoid paying their debts to the United States."  (*Id.* at 23.)  The Court held Big D's, Ms. Bayley, and Mr. Bayley as trustee of Frihet Trust conducted a fraudulent transfer in violation of 28 U.S.C. § 3304(a)(1)(A)–(B) and 28 U.S.C. § 3304(b)(1)(A).  (*See supra* Part III Section C.)

Accordingly, Plaintiff may obtain "a remedy under [the FDCPA] against the asset transferred or other property of the transferee[.]"  28 U.S.C. § 3306(a)(2).  Under the FDCPA, courts may issue writs of execution.  28 U.S.C. § 3203(a) ("All property in which the judgment debtor has a substantial nonexempt interest shall be subject to levy pursuant to a writ of execution.")  "On written application of counsel for the United States, the court may issue a writ of execution."  28 U.S.C. § 3203(c)(1).  A sale will not be executed until 90 days after the Mashal levies on the Site.  28 U.S.C. § 3203(g)(1)(A)(i)(I).  Plaintiff argues "[t]he power to avoid attachment is squarely in Defendants' hands" because if Defendants satisfy the judgment in full before the 90-day period then the Marshal will return the Site without selling it.

In this case, a writ of execution against the Site appears reasonable should Defendants fail to pay the $250,000 civil penalty.[12]  However, Frihet Trust is not a party to this action and Defendants will not be jointly and severally liable for the entire $250,000.  The Court questions its authority to authorize a writ for $250,000 when the Defendants are not joint and severally liable for the entire amount and a nonparty owns the property.

Accordingly, by May 3, 2023, Plaintiff shall file a supplemental briefing of no more than six pages which addresses issues raised by the Court.  Defendants shall file any responsive brief of no more than six pages by May 10, 2023.

## IV    CONCLUSION

Accordingly, and having considered Plaintiff's motion, the briefing of the parties, and the remainder of the record, the Court finds and ORDERS that:

1. Plaintiff's motion for default judgment (Dkt. No. 186) is GRANTED and default judgment is ENTERED against all Defendants on all of Plaintiff's claims.

2. Pursuant to 33 U.S.C. § 1319(b), Defendants are ordered to make a compensatory mitigation payment of $33,492.10 to the Hood Canal Coordinating Council's In-Lieu Fee Program.  Defendants are jointly and severally liable for this payment.

3. Pursuant to 33 U.S.C. § 1319(d), Defendants are ordered to pay a $250,000 civil penalty to the United States as set forth below:

---

[12] It is unclear to the Court, because Plaintiff has not elucidated, whether the compensatory mitigation payment of $33,492.10 to the HCCC In-Lieu Fee Program constitutes a "debt" owed to the United States under the FDCPA.  A debt means "an amount that is owing to the United States on account of a direct loan, or loan insured or guaranteed, by the United States; or . . . an amount that is owing to the United States on account of a fee, duty, lease, rent, service, sale of real or personal property, overpayment, fine, assessment, penalty, restitution, damages, interest, tax, bail bond forfeiture, reimbursement, recovery of a cost incurred by the United States, or other source of indebtedness to the United States, but that is not owing under the terms of a contract originally entered into by only persons other than the United States[.]"  28 U.S.C. 3002(3)(A)–(B).

a.   Philip Bayley in his capacity as trustee of Frihet Trust shall pay $115,750.

b.   Philip Bayley in his individual capacity shall pay $80,550.

c.   Joan Bayley shall pay $26,850.

d.   Big D's Beach Cabin LLC shall pay $26,850.

4.   Plaintiff SHALL file a supplemental brief regarding its requested writ of execution by May 3, 2023.  The supplemental brief shall be no more than six pages.  Defendants SHALL file any responsive brief of no more than six pages by May 10, 2023.

Dated this 26th day of April, 2023.

David G. Estudillo
United States District Judge

ORDER GRANTING PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT (DKT. NO. 186) - 28